Nathan W. Kellum*
TN Bar #13482, MS Bar #8813
nkellum@crelaw.org
Center for Religious Expression
699 Oakleaf Office Lane, Suite 107
Memphis, TN 38117
Telephone: (901) 684-5485
Facsimile: (901) 684-5499
*Application for Admission *Pro Hac Vice* filed concurrently

Robert H. Tyler
CA Bar # 179572
rtyler@tylerbursch.com
Advocates for Faith & Freedom
24910 Las Brisas Road, Suite 110
Murrieta, CA 92562
Telephone: (951) 600-2733
Facsimile:   (951) 600-4996

*Attorneys for Plaintiffs Alexander Stewart and Andrew Conway*

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANSCISO DIVISION

| | |
|---|---|
| ALEXANDER STEWART and ANDREW CONWAY, <br><br> Plaintiffs, <br><br> vs. <br><br> CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA, ROSANNA PEREZ, Park Ranger with San Francisco Recreation and Parks Department, JONATHAN WEBB, Park Ranger with San Francisco Recreation and Parks Department, and JESSICA WALLACE, Park Ranger with San Francisco Recreation and Parks Department, <br><br> Defendants. | Case No. _____ <br><br> **VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND NOMINAL DAMAGES** <br><br> **[Civil Rights Suit – 42 U.S.C. § 1983]** |

Comes now Plaintiffs, Alexander Stewart and Andrew Conway, by counsel, and aver the following:

## INTRODUCTION

1.     This is a civil rights action brought under 42 U.S.C. § 1983 and the California State Constitution challenging the federal and state constitutionality of the City and County of San Francisco Park Code § 7.03 on its face and as applied to Plaintiffs' religious worship and expression in San Francisco public parks.

2.     Plaintiffs seek injunctive relief, declaratory relief, and nominal damages against Defendants named herein.

3.     This action is premised on the United States Constitution and California State Constitution, concerning the deprivation of Plaintiffs' fundamental rights to free speech, liberty of speech, due process, free exercise of religion, equal protection and freedom of assembly.

4.     Defendants' actions have deprived and will continue to deprive Plaintiffs of their fundamental rights as provided in the First and Fourteenth Amendments to the United States Constitution and in Article 1 of the California State Constitution.

5.     Each and every act of Defendants as alleged herein was committed by Defendants named herein, and each and every act was committed under the color of state law and authority.

## JURISDICTION AND VENUE

6.     This action raises federal questions under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1983 and 1988.

**COMPLAINT**

7.     This Court has original jurisdiction over federal claims by operation of 28 U.S.C. §§ 1331 and 1343.  This Court has supplemental jurisdiction over the California State Constitution claims under 28 U.S.C. § 1367.

8.     This Court has authority to grant the requested injunctive relief and nominal damages under 28 U.S.C. § 1343, the requested declaratory relief under 28 U.S.C. §§ 2201 and 2202, and costs and attorney's fees under 42 U.S.C. § 1988.

9.     Venue is proper in the Northern District of California under 28 U.S.C. § 1391(b) because all actions giving rise to this case occurred within the Northern District of California and all Defendants reside in this district.

## PARTIES

10.     Plaintiff Alexander Stewart ("Stewart") is and was at all times relevant to this action a resident of Oakland, California.

11.     Plaintiff Andrew Conway ("Conway") is and was at all times relevant to this action a resident of Oakland, California.

12.     Defendant City and County of San Francisco, California ("San Francisco") is a municipal corporation established, organized, and authorized under and pursuant to the laws of the State of California.

13.     Defendant Rosanna Perez ("Perez") is a park ranger with San Francisco Recreation and Parks Department and is sued in her individual capacity.  She is responsible for enforcing San Francisco Park Code.

14.     Defendant Jonathan Webb ("Webb") is a park ranger with San Francisco Recreation and Parks Department and is sued in his individual capacity.  He is

**COMPLAINT**

responsible for enforcing San Francisco Park Code.

15.     Defendant Jessica Wallace ("Wallace") is a park ranger with San Francisco Recreation and Parks Department and is sued in her individual capacity. She is responsible for enforcing San Francisco Park Code.

## STATEMENT OF FACTS

### Stewart, Conway, and Christ's Forgiveness Ministries Church

16.     Stewart and Conway are evangelical Christians.

17.     As Christians, Stewart and Conway want to worship God on a regular basis.

18.     Stewart and Conway are both affiliated with Christ's Forgiveness Ministries ("CFM") San Francisco church, a community of Christians who worship together in the San Francisco area.

19.     Stewart is an elder with CFM San Francisco church, a position of leadership within the church.

20.     CFM is a non-denominational Christian ministry which originated in Canada and seeks to serve the world through evangelism and church planting.

21.     Stewart and Conway believe in and adhere to CFM's statement of faith.

22.     Stewart and Conway believe the Bible is the inspired word of God.

23.     They also believe in salvation by faith in Jesus Christ.

24.     Additionally, Stewart and Conway believe in church fellowship and regular assembly of worship with fellow Christians.

25.     Stewart and Conway's biblical basis for regular worship together is

taken from Hebrews 10:25 in the Bible, stating, "Let us not give up the habit of meeting together."

26.     Stewart and Conway, in accordance with their biblical beliefs, and as observed in CFM's statement of faith, believe church fellowship and the mission of Jesus Christ is to proclaim the gospel of Jesus Christ to the world.

27.     Also, in line with biblical depiction of corporate worship and as set out in CFM's statement of faith, Stewart and Conway believe worship must include preaching of the gospel, reading the Bible, teaching from the Bible, public prayer, singing and playing of instruments in praise of God, and observation of the Lord's Supper (also known as "communion").

28.     Regular participation in communion is commanded by the Bible in Mark 14:22-25.   This activity acts as a memorial of Jesus Christ's death, involving presentation and consumption of elements, form of bread and wine, symbolizing the blood and body of Jesus Christ.

29.     Both Stewart and Conway consider worship with CFM San Francisco church as one of their greatest joys and blessings and would like others to experience this joy as well.

30.     Stewart, Conway, and other participants in CFM San Francisco church gather every week on Sunday morning for worship, during which time they fellowship with other Christians and display the love and transformative power of Jesus Christ to non-Christians.

**Stewart and Conway's Worship Activities in San Francisco Public Parks**

31.    CFM San Francisco church leaders, including Stewart, want to have regular weekly worship services in San Francisco public parks.

32.    Other churches in the CFM network utilize outdoor public parks to conduct their worship services.

33.    CFM San Francisco church, as a church plant who does not own property, would like to take advantage of San Francisco public parks, which are freely accessible and well-suited for worship activities.

34.    Stewart, Conway, and others with CFM San Francisco church want to serve the San Francisco community by conducting worship in public, accessible places where they can share the gospel of Jesus Christ with others.

35.    Public parks are also free and affordable venues for worship activities.

36.    The number of people attending CFM San Francisco church worship services vary in number, averaging between 40 to 70 attendees.

37.    CFM San Francisco church worship services follow the biblical structure of corporate worship as recognized in the Bible and CFM's statement of faith.

38.    A typical CFM San Francisco church worship service begins with musical instruments and singing for 30 minutes, followed by speaking and testimonies for 30 minutes, communion and offering for 15 minutes, a sermon from a biblical passage for a little over an hour, and ends with prayer.

39.    CFM San Francisco church uses amplification for the music and singing, as well as with preaching and prayer, so attendees can hear, understand, and participate in the worship service.  Stewart, Conway, and other attendees cannot

effectively participate in these worship speech activities without amplification.

40.    CFM San Francisco church uses a table to hold containers of bread and wine during communion to facilitate the distribution of these elements.  They need a table to conduct communion.

**Attempt to Worship on January 24, 2021, at Palace of Fine Arts Park**

41.    On Sunday, January 24, 2021, Stewart and Conway were among a group of people with CFM San Francisco church who gathered in an outdoor area of the Palace of Fine Arts Park to participate in a worship service.

42.    Stewart and other church leaders chose the Palace of Fine Arts Park because the outdoor venue is unique, with a dome and columns, and good setting for a worship gathering.

43.    Palace of Fine Arts Park is a public park managed and operated by the San Francisco Recreation and Parks Department ("SFRPD").

44.    Palace of Fine Arts Park is a popular park, giving the CFM San Francisco church an opportunity to witness to many people through their public worship.

45.    Palace of Fine Arts Park is also a well-known destination to prospective attendees of the worship service, not far from the Golden Gate bridge, and easy to find.  It serves as a central and appealing location for the gathering.

46.    On the day they visited Place of Fine Arts Park, January 24, 2021, Stewart, Conway, and others with CFM San Francisco church started the worship service at the time they typically do, at 10:00 a.m., that Sunday morning.

**COMPLAINT**

47.     At about an hour and a half into the worship service, a SFRPD officer, Ranger Perez, approached church attendees while they were still worshipping in the park.

48.     Ranger Perez eventually spoke with Stewart, as a leader and representative of the church.

49.     The ranger informed Stewart that CFM San Francisco church needed a permit under San Francisco Park Code § 7.03(i), which requires a permit for a "concert" or "musical performance" with sound amplification equipment.

50.     Ranger Perez issued a citation to Stewart carrying a fine of $192.00.

51.     Stewart, Conway, and the others disagreed with the park ranger depicting their worship service as a concert or musical performance.

52.     Still, Stewart, Conway, and the church leaders decided to pay the fine and hoped to find another park where they could freely worship.

53.     Stewart and Conway believed the park rule restricting amplification was limited to the Palace of Fine Arts Park due to the iconic and touristy nature of the venue.  They did not believe the rule would apply in other parks.

**Attempt to Worship on Sunday, February 7, 2021, at Potrero del Sol Park**

54.     Following the incident at Palace of Fine Arts Park, Stewart and other church leaders decided to go to Potrero de Sol Park for worship service, believing a permit was not needed to worship in that location.

55.     The church chose Potrero del Sol Park because the park is remote and not near popular Palace of Fine Arts Park, but still a good venue for their worship.

**COMPLAINT**

56.     They also wanted to avoid further park fines.

57.     Stewart and other church leaders were aware of a labyrinth and stage located in Potrero de Sol Park that would serve well for their worship activities.

58.     Potrero del Sol Park is a public park managed and operated by the SFRPD.

59.     On Sunday, February 7, 2021, as planned, CFM San Francisco church attendees met at Potrero de Sol Park to hold a worship service in the labyrinth and stage area of the park.

60.     Stewart, Conway, and the rest of the CFM San Francisco church assembly believed they could avoid park ranger interference at Potrero del Sol Park and worship freely there.

61.     The worship service at its usual 10:00 a.m. time with approximately 50 people in attendance.

62.     However, within 30 minutes after the worship service started, another SFRPD officer, Ranger Webb, arrived on the scene.

63.     Ranger Webb met with two church leaders, Stewart and Ryan Simpkins ("Simpkins"), to discuss the ranger's concerns.

64.     Ranger Webb informed them that the church could not conduct their worship activity with amplification.

65.     Stewart explained they were not causing any problems, but the ranger indicated that his office had received complaints about the worship service.

66.     The church leaders advised that they would turn down the volume if

9

**COMPLAINT**

noise was a concern, but Ranger Webb was not swayed by this suggestion.   He informed the issue concerned the very use of amplification, not noise level.

67.     Ranger Webb informed Stewart and Simpkins that SFRPD has park rules, that he was obliged to enforce the park rules, and the church's only recourse is to get the park rules changed.

68.     Regarding the specific rule invoked against the church, Ranger Webb cited § 7.03(i) requiring a permit for the use of amplification in a musical concert or performance.

69.     Simpkins offered that they were willing to work with the City and inquired of any way they could avoid a citation.

70.     But Ranger Webb insisted on issuing a citation to them, explaining a citation was needed because the church had previously violated a park rule at another park.

71.     Ranger Webb added that the church needs a permit for amplification, and, without a permit, they could not use the amplifier in the park.

72.     Simpkins advised they would turn off the amplifier and asked whether their compliance would allow them to avoid a citation.   Ranger Webb repeated they could not avoid a citation.

73.     Simpkins objected to a citation for violating First Amendment rights in a public park.   Ranger Webb said he would not debate the constitutionality of the matter and invited Simpkins and Stewart to contest the matter in the court system.

74.     Stewart asked if he could see the law, discern how they violated it, but

**COMPLAINT**

Ranger Webb declined to show him the law, informing he does not usually show people the laws they violate.

75.     Ranger Webb elicited personal information from Stewart to issue him a citation.

76.     At Ranger Webb's prompting, two San Francisco police officers joined the conversation.  In the presence of these officers, Ranger Webb asked Stewart and Simpkins to turn off the amplification and for their group to disperse, explaining they needed to leave the park because they violated a park rule.

77.     Stewart asked again if he could see the park rule they were purportedly. Ranger Webb refused, saying they had to find the park rule on their own.

78.     Ranger Webb confirmed the basis for the citation was using amplification without a permit.

79.     Stewart and Simpkins asked the police officers whether a permit is needed to have a protest in a San Francisco park and the officers indicated no permit is required for a protest as long as the event is unplanned.

80.     Noting the distinction, Simpkins said they could depict the church gathering as a type of protest.  The officers did not respond to this idea.

81.     Ranger Webb issued a citation to Stewart.

82.     Afterwards, Ranger Webb warned Stewart and Simpkins to turn off the amplified sound immediately and leave the park within 10 minutes.  The ranger then walked off with the police officers.

83.     Stewart and Simpkins apprised CFM San Francisco church assembly of

11
**COMPLAINT**

the situation and broke up the worship service.

84.     Though the CFM San Francisco church assembly, including Stewart and Conway, believed they had a right to worship in a public park with reasonable level of amplified sound without the need for a permit, they did not want to risk arrest and left theh park.

85.     Stewart subsequently noticed the fine for the citation doubled, totaling $384.00.

86.     Stewart paid the fine of $384 to avoid further difficulty.  But he and other church leaders did not want to incur any future fines.

**Attempt to Worship on Sunday, February 21, 2021, at McClaren Park**

87.     Stewart, Conway, along with others in the CFM San Francisco church, were discouraged from worshipping in San Francisco public parks due to their encounters with park rangers and citations.

88.     To avoid another citation, they elected to go to a different public park where amplification was not as essential.  Stewart and the church leaders settled on a portion of McClaren Park to have a worship service.

89.     Stewart and Conway and other church leaders believed the acoustics in an area near the basketball court in McClaren Park would allow them to facilitate worship without amplification, though they were unsure how well they could be heard without amplification.

90.     On Sunday, February 21, 2021, Stewart, Conway, and other members of CFM San Francisco church met at McClaren Park for worship, starting at 10:00 a.m.

1    that Sunday morning.

2        91.    McClaren Park is a public park managed and operated by the SFRPD.

3        92.    Stewart and other CFM San Francisco church leaders planned to

4    worship this day without using amplification.

5        93.    They specifically selected the spot in McClaren Park on the side of an

6    open-air basketball court because it offers good acoustics for sound.

7        94.    CFM San Francisco church had around 50 people participating in the

8    worship that day.

9        95.    While the lack of amplification hampered their ability to communicate

10   with attendees, the acoustics in the area did make the worship activity doable.

11       96.    However, after CFM San Francisco church had engaged in worship for

12   about an hour or so, Park Ranger Muyco walked up to the gathering while one of the

13   church leaders, Stewart, was preaching to the assembly.

14       97.    Another church leader, Ahmed Akbar, left the worship service to meet

15   and speak with Ranger Muyco on a nearby sidewalk.

16       98.    Ranger Muyco informed Akbar that the church group needed a permit

17   for their worship activity in the park.

18       99.    Akbar questioned the directive, pointing out that they were not using

19   amplification.

20       100.   Ranger Muyco answered the activity would still require a permit if they

21   had a certain number of people gathering.

22       101.   The ranger added that he had received a complaint and would

**COMPLAINT**

appreciate it if the church group would pack up and leave.

102.   Akbar reiterated that they were not using amplification, which he understood was the activity prohibited by park rule.

103.   Ranger Muyco indicated the best he could do was give the church a few minutes to wrap it up.

104.   Akbar advised Ranger Muyco that Stewart had another 20 minutes left of his sermon, but the ranger was unwilling to give them 20 minutes.

105.   Akbar was confused by the order and shared his confusion with Ranger Muyco, observing that park rangers had previously warned them about amplification and not the number of participants.

106.    Ranger Muyco stressed the church's need for a permit, advising they were in violation of a park rule and had to clear out.  He added that he did not make up the park rules, he enforces them.

107.   Akbar responded that the church understands and respects the park ranger's authority, but he hoped the ranger could consider that they were warned about amplification and had complied with that requirement.  He asked the ranger if he could let Stewart finish his sermon before departing.

108.   Ranger Muyco walked closer to the gathering and Simpkins left the worship service to meet him.

109.   Stewart continued to preach while Simpkins spoke with Ranger Muyco.

110.   Ranger Muyco informed Simpkins that the church group needed a permit because they were violating a park rule.

111.   The ranger said the best he could do was give them time to pack up and clear out.

112.   Simpkins asked if there was a reason why they needed a permit to be in a public park, referencing people who were standing nearby and apparently there to play basketball.

113.   Ranger Muyco answered the church needed a permit due to the number of people in attendance at their event.

114.   The park ranger said he needed more information from them, particularly, from the person in charge.  Akbar informed several church leaders were in charge of the assembly.

115.   Ranger Muyco then walked toward Stewart who was still speaking to the group at that time.  Simpkins asked the ranger to not interrupt him, but the ranger walked up to speaker anyway, and told him the group was committing a park violation.

116.   Ranger Muyco then walked off and spoke with someone on his hand-held radio for approximately 15 minutes.

117.   After which time, Ranger Muyco came back to Akbar and Simpkins, and was accompanied by another park ranger, Ranger Wallace.

118.   Ranger Muyco reiterated that the church needed to leave the park. Akbar retorted that they have freedom of speech and to assemble together.

119.   Ranger Wallace spoke up and asked Akbar and Simpkins if they were about to wrap up their worship activity. She observed that people walk by and see

the church gathering and complain to the park rangers about it, and suggested they get a permit for their activity.

120.   Akbar told Ranger Wallace they respect the law but informed her that previous park rangers specified a concern about amplification and did not mention any concerns about the number of attendees at their event.

121.   Akbar asked, in light of just learning about the additional concern over the number of participants, if they could let Stewart finish before having to leave.

122.   Ranger Wallace indicated the speaker could finish his delivery but the crowd had to spread out due to concerns over COVID-19 restrictions.

123.   Both rangers walked off, and church leaders, including Stewart and Conway, assumed they had concluded their discussions with the rangers.   They brought an end to the worship service and anticipated leaving the park soon thereafter.

124.   However, as they were packing up to leave, Ranger Wallace came back to Akbar and started filling out a citation for violating a park rule.

125.   Ranger Wallace asked Akbar for his personal information to issue a citation.

126.   Akbar was perplexed about receiving a citation and was reticent to give her personal information.   Ranger Wallace said he had to give her the information or she would get the police involved.

127.   Akbar advised that he thought they had received a warning and complied, but Ranger Wallace indicated the church group needs to know they need a

permit for future gatherings and a citation helps serve that purpose.

128.   Ranger Wallace added the church could obtain a permit by going through the permits department.

129.   Akbar was troubled by the need for a permit.  He asked if they would a need a permit if only 10 people attended the service.  Ranger Wallace indicated she did not know, she does not work in the permits department, but they could get with permits department about the requisite number.

130.   Akbar did not understand why they were receiving a citation.  He pointed out to Ranger Wallace that she had to have some number in mind to conclude that their number in attendance was violating the park rule.

131.   Ranger Wallace ignored the concern and did not explain how she could give a citation without knowing the cap on number of attendees set out in the park rule.  She gave Akbar contact information for the permits department and encouraged the church to obtain a permit for their next gathering in a public park.

132.   Ranger Wallace issued a citation to the group for using a foldable table during communion in violation of § 7.03(t).

133.   The fine for the citation was $384.00

**Attempt to Worship on Sunday, March 21, 2021, at United Nations Plaza**

134.   Despite the troubling and constant presence of SFRPD officers at their worship services and the recurring citations they were receiving, Stewart, Conway, and the rest of the church did not wish to give up their right to worship in public places.

**COMPLAINT**

135.   The church next chose, on Sunday, March 21, 2021, to go to public space in the United Nations (U.N.) Plaza, an area they not consider a public park and thought was under federal control.

136.   They also chose this location because of their evangelistic mission, believing the church could be a light in the darkness for hurting people in the vicinity of the plaza.

137.   Stewart, Conway, and others in CFM San Francisco church arrived on this day, at 10:00 a.m. that Sunday morning and proceeded with their worship service.  They had approximately 50 people in attendance at the service.

138.   But Ranger Wallace soon arrived on the scene while they were worshipping and promptly wrote out a citation for violating § 7.03.  She also wrote out a citation for violating § 3.07 pertaining to the posting of signs.

139.   Ranger Wallace does not specify the subsection of § 7.03 for which she was issuing the citation to CFM San Francisco church.  She originally wrote a violation of §7.03(i)(2) dealing with amplification on the citation but struck it out, signaling an intention not to pursue a violation under that subsection.

140.   Ranger Wallace issued the citation without explaining which subsection the church had violated with its worship.

**Attempts to Explore a Permit to Worship in San Francisco Public Parks**

141.   Wanting to avoid further interruptions with their worship and additional fines, Conway, on behalf of CFM San Francisco church, decided to explore the need to obtain a permit for conducting worship activity in San Francisco public

parks and the process for obtaining a permit.

142.   On March 22, 2021, Conway contacted SFRPD office about the need for a permit to conduct worship activity in a public park.  The official directed Conway to fill out an online application to obtain a permit for conducting worship.

143.   Before doing so, Conway looked up the permit requirement in San Francisco Park Code, § 7.03, which reads in its entirety:

> No person shall, without a permit, perform any of the following acts in any park:
> (a) Conduct or sponsor a parade involving (1) 50 or more persons; (2) the use of any street in any park; or (3) vehicles.
> (b) Conduct or sponsor an event in which persons engage in petitioning, leafletting, demonstrating or soliciting when the number of petitioners, leafletters, demonstrators, or solicitors engaging in one or more of these activities involves 50 or more such persons at the same time within an area circumscribed by a 500 foot radius.
> (c) Engage in soliciting in the Music Concourse Area of Golden Gate Park. This subsection shall not preclude the Commission from prohibiting persons from soliciting inside the Japanese Tea Garden.
> (d) Sell or offer for sale books, newspapers, periodicals or other printed material.
> (e) Conduct or sponsor any exhibit, promotion, dramatic performance, theatrics, pantomime, dance, fair, circus, festival, juggling or other acrobatics or show of any kind or nature which has been publicized four hours or more in advance.
> (f) Perform any feat of skill or produce any amusement show, movie or entertainment which has been publicized four hours or more in advance.
> (g) Make a speech which has been publicized four hours or more in advance.
> (h) Conduct or sponsor a religious event involving 50 or more persons;
> (i) Conduct or sponsor a concert or musical performance which (1) has been publicized four hours or more in advance, or (2) utilizes sound amplification equipment, or (3) involves a band or orchestra.
> (j) Participate in a picnic, dance or other social gathering involving 25 or more persons.
> (k) Sell or provide food to persons, except that no permit is required when a person participating in a picnic or social gathering of 25 or

fewer persons provides food to others who are also participating in the picnic or social gathering.

(l) Conduct or sponsor a race or marathon which involves 25 or more persons as participants or which obstructs or interferes with the normal flow of vehicular or pedestrian traffic.

(m) Conduct or sponsor any event which utilizes sound amplification equipment, as defined in Part II, Chapter VIII (Police Code) of the San Francisco Municipal Code.

(n) Conduct or sponsor an exhibition.

(o) Conduct or sponsor an animal show.

(p) Conduct a wedding ceremony.

(q) Conduct or sponsor an art show.

(r) Operate any amusement park device. The Commission may prohibit the operation of
such devices in any park or, if it allows such operation, may designate those locations
where such operation is permitted.

(s) Conduct or sponsor an organized kite-flying event of any club or organization.

(t) Station or erect any table, scaffold, stage, platform, rostrum, tower, stand, bandstand,
building, fence, wall, monument, dome or other structure.

144.    After reviewing § 7.03, Conway determined the church would need a permit for the worship activity in public parks under the park rules, noticing § 7.03(h) requires a permit for a "religious event" in a public park involving 50 or more people and that they typically have 50 or more people.

145.    Conway filled out the permit application on this same date, March 22, 2021, requesting use of U.N Plaza, and listing McClaren Park as second choice, for the upcoming Sunday of March 28, 2021, starting at 10:00 a.m. and ending at 1:00 p.m., and for consecutive Sundays following thereafter.

146.    Hoping to avoid the permit requirements altogether, he labelled the activity as a protest, but he acknowledged the religious nature of the event and that the group anticipated 50 people.

147.   The following day, March 23, 2021, Shauna Bogetz, Supervisor of Special Events, Permits and Reservations with the SFRPD, emailed Conway about his application, copying Stacey Cataylo, also an employee in the Special Events, Permits and Reservations department, on the email, and confirmed the church's need for a permit.

148.   In her email, Bogetz, stated U.N. Plaza could not accommodate a group of Conway's size while adhering to social distance requirements.  She added that McClaren Park was available to them, but only in a lawn area across from the parking lot.  She further informed that Conway's church group could only obtain three permits at a time and would have to apply for new permits after exhausting these three permits.

149.   Conway believed the lawn area in McClaren Park was less than ideal, the church preferred the area near the basketball court, but he was tasked to find for a place for their worship service.  He emailed Bogetz later that day, on March 23, 2021, and confirmed that they wanted to pursue the permit for the lawn area space in the park.  He asked Bogetz of the next steps in the process.

150.   The next day, March 24, 2021, Cataylo contacted Conway and they spoke over the phone about the permitting process.  She asked for details about the worship activities he anticipated taking place in the park and Conway explained how the worship service would work, with preaching, music, and prayer with amplification, and communion.

151.   Also, during this phone call, Cataylo elaborated on the requirements the

21

**COMPLAINT**

church would need to meet to obtain a permit.  These requirements included a health and safety plan, a certificate of insurance for coverage of two million dollars, payment of permit fee, and a bond.

152.    For the health and safety plan, Cataylo directed that every attendee had to sign their names on a list the day of the event to ensure they were each following COVID protocols.

153.    Cataylo followed up with an email to Conway on this same day of March 24, 2021, confirming the activities of the church in the park and the requirements for the permit.

154.    Receiving this email, Conway emailed back on March 25, 2021, thanking Cataylo, advising that he would follow up with any questions.

155.    Later that afternoon, on March 25, 2021, Cataylo wrote Conway again, informing the SFRPD had set up an invoice for the CFM San Francisco church to pay to complete the permit process.  Cataylo also advised that any sound going beyond the picnic area could result in the church incurring an additional cost for having a park ranger come and staff the event.

156.    Conway passed along the information to Stewart and other church leaders.

157.    CFM San Francisco church leaders determined they could not go forward with the permit for the park due to the cost and burdensome requirements and wanted to see if they could avoid the necessity of a permit.

158.    Though CFM San Francisco church typically had 50 or more attendees

**COMPLAINT**

at their services, Stewart and other leaders thought it possible they could temporarily

cap attendance at 49 to ensure a place for them to worship.

159.   On April 5, 2021, Conway followed up with an email to Cataylo advising

that they did not need a permit after all anticipating attendance of less than 50

participants.

160.   However, by email dated April 6, 2021, Cataylo informed the church

group would still need a permit due to their use of either amplification or a table.

161.   On April 7, 2021, Conway asked Cataylo to confirm the church would

need a permit for a religious event with at least 50 people, or for using amplification,

or for using a table, and, on the following day, April 8, 2021, Cataylo did so.

162.   Due to the park rules and onerous permit restrictions, Stewart and

Conway, along with other CFM San Francisco church leaders, concluded they could

not use San Francisco public parks for their worship services.

**San Francisco Maintains Ongoing Restriction on Worship in Public Parks**

163.   On April 15, 2021, Stewart and Conway sent a letter to the Mayor of

San Francisco, City Attorney, and SFRPD Chief Park Ranger, seeking relief from the

ongoing park rule restrictions.

164.   The letter described the four times SFRPD officers stopped CFM San

Francisco worship services in four different public parks, Stewart and Conway's

interactions with SFRPD officers, the citations they received, and the difficulty with

the permitting process.

165.   The letter also substantiated their constitutional right to engage in

religious worship and speech and activities in San Francisco public parks without having to obtain a permit.

166.    Stewart and Conway asked San Francisco authorities to reimburse the amount of $576.00 Stewart paid for fines, attorney fees incurred, dismiss the citations where the fines had not yet been paid, and to provide written assurance that the City and SFRPD would no longer apply § 7.03 permit requirements to Stewart, Conway, or anyone else associated with CFM San Francisco church wishing to engage in worship service in San Francisco public parks.

167.    On April 26, 2021, Deputy City Attorney for San Francisco emailed back. In this communication, the attorney did not address the issues in the letter and asked the church group secure a permit for the religious gathering.

168.    Dissatisfied with this response, counsel for Stewart and Conway, on April 27, 2021, asked Deputy City Attorney to address the concerns set out in the letter.

169.    In reply, on April 29, 2021, the Deputy City Attorney declined to alleviate or address the constitutional concerns.   Instead, the attorney suggested Stewart and Conway obtain a permit for park use.

170.    Writing back, April 30, 2021, counsel for Stewart and Conway reiterated the request for counsel for San Francisco to address the concerns specified in the letter.

171.    On May 4, 2021, counsel for San Francisco responded in an email stating that § 7.03 and its application to Stewart and Conway are constitutionally valid and

reminded of the need for a permit for religious worship.

172.    Stewart and Conway were disappointed to learn of this stance.   The burdensome permitting scheme set out in the park rules functions as an unconstitutional prior restraint on their religious worship and speech.

173.    Stewart and Conway are chilled and deterred from engaging in worship and religious speech in San Francisco parks for fear of criminal sanction.

174.    This adverse impact of chilling and deterring Stewart and Conway from exercising their constitutional rights in public parks constitutes irreparable harm to them.

175.    Stewart and Conway have no adequate remedy at law for the loss of their constitutional rights.

**FIRST CAUSE OF ACTION**

**Violation of Free Speech Clause**

**United States Constitution**

176.    Stewart and Conway re-allege and incorporate herein by reference all preceding paragraphs.

177.    The First Amendment to the United States Constitution, applied to the States through the Fourteenth Amendment, prohibits an unconstitutional abridgment on free speech.

178.    Stewart and Conway's religious speech is protected speech under the First Amendment.

179.    San Francisco's permit scheme acts as an unconstitutional prior

**COMPLAINT**

restraint that prohibits Stewart and Conway from engaging in expressive activities.

180. Stewart and Conway challenge San Francisco Park Code § 7.03 on its face and as applied to their religious speech.

181. Section 7.03:

a. is vague and overbroad;

b. discriminates against speech because of speakers' content;

c. restrains constitutionally-protected speech in advance of its expression, without appropriate guidelines or standards to guide the discretion of officials charged with enforcing the policy;

d. chills the free speech of Conway and Stewart and of other third party citizens;

e. allows for the exercise of unbridled discretion;

f. lacks narrow tailoring, fails to achieve any legitimate government purpose, and fails to leave open alternative avenues for expression;

g. is unreasonable.

182. Defendants have no compelling or legitimate reason that can justify the restriction on Stewart and Conway's religious speech in San Francisco public parks through the application and enforcement of the permit scheme.

WHEREFORE, Stewart and Conway respectfully pray the Court grant the equitable and legal relief set forth in the prayer for relief.

## SECOND CAUSE OF ACTION

## Violation of the Due Process Clause

**COMPLAINT**

**United States Constitution**

183.    Stewart and Conway re-allege and incorporate herein by reference all preceding paragraphs.

184.    The Fourteenth Amendment to the United States Constitution requires citizen be given due process under the law.

185.    San Francisco Park Code § 7.03 is too vague to give persons of reasonable intelligence fair notice of what activities are proscribed.

186.    San Francisco Park Code § 7.03 lacks sufficient objective criteria to guide park authorities and enforcement officers to prevent arbitrary and discriminatory enforcement.

187.    San Francisco Park Code § 7.03 vests park authorities and enforcement officers with unbridled discretion to grant, deny, modify, or revoke permits.

188.    Defendants have no compelling or legitimate reason that can justify their vague park code or their policies enforcing them.

189.    San Francisco Park Code § 7.03 and Defendants' enforcement thereof violate the Due Process Class of the Fourteenth Amendment to the United States Constitution.

WHEREFORE, Stewart and Conway respectfully pray the Court grant the equitable and legal relief set forth in the prayer for relief.

**THIRD CAUSE OF ACTION**

**Violation of Free Exercise of Religion Clause**

**United States Constitution**

**COMPLAINT**

190.    Stewart and Conway re-allege and incorporate herein by reference all preceding paragraphs.

191.    The First Amendment to the United States Constitution, applied to the States through the Fourteenth Amendment, prohibits the unconstitutional abridgment of the free exercise of religion.

192.    Both Stewart and Conway have a personal religious belief in the biblical mandate to engage in regular worship, gather with fellow believers, and to share their faith in community with other believers.

193.    San Francisco Park Code § 7.03 prohibits Stewart and Conway from freely exercising their religion, specifically restricting religious events and critical aspects of worship activity.

194.    Defendants' enforcement requires Stewart and Conway to cease their religious worship, imposing a substantial burden on the freedom to exercise their religion.

195.    On its face and as applied, San Francisco Park Code § 7.03 unconstitutionally impedes Stewart and Conway's right to free exercise of religion without any rational, substantial, or compelling government interest for doing so.

WHEREFORE, Stewart and Conway respectfully pray the Court grant the equitable and legal relief set forth in the prayer for relief.

## FOURTH CAUSE OF ACTION

### Violation of Equal Protection Clause

### United States Constitution

**COMPLAINT**

196.   Stewart and Conway re-allege and incorporate herein by reference all preceding paragraphs.

197.   Under San Francisco Park Code § 7.03, Defendants have allowed and continue to allow expressive and non-expressive activities to take place in San Francisco public parks while prohibiting Stewart and Conway from participating in like activity in same locations.

198.   Defendants' enforcement of San Francisco Park Code § 7.03 discriminates against Stewart and Conway in comparison to other similarly-situated individuals.

199.   Defendants have no compelling or legitimate reason that would justify their disparate treatment.

200.   San Francisco Park Code § 7.03 on its face and as applied violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

WHEREFORE, Stewart and Conway respectfully pray the Court grant the equitable and legal relief set forth in the prayer for relief.

## FIFTH CAUSE OF ACTION

### Violation of Freedom of Assembly Clause

### United States Constitution

201.   Stewart and Conway re-allege and incorporate herein by reference all preceding paragraphs.

202.   The First Amendment of the Constitution protects the "right of the

people peaceably to assemble."

203.   By denying Stewart and Conway the ability to assemble for CFM San Francisco worship services in all San Francisco public parks, San Francisco Park Code § 7.03 violates the Freedom of Assembly Clause.

204.   San Francisco Park Code § 7.03 greatly limits Stewart and Conway's ability to gather together and engage in worship with others associated with CFM San Francisco church.

205.   Imposing a burdensome and restrictive permitting scheme that targets worship activities is not the least restrictive means of achieving any legitimate goals.

206.   San Francisco Park Code § 7.03 violates the Freedom of Assembly Clause of the First Amendment to the United States Constitution.

WHEREFORE, Stewart and Conway respectfully pray the Court grant the equitable and legal relief set forth in the prayer for relief.

### SIXTH CAUSE OF ACTION

### Violation of the Liberty of Speech Clause

### California State Constitution

207.   Stewart and Conway re-allege and incorporate herein by reference all preceding paragraphs.

208.   The Liberty of Speech Clause of the California State Constitution, set out in Article 1, § 2(a), reads: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of that right.  A law may not restrain or abridge liberty of speech or press."

**COMPLAINT**

209.    The Liberty of Speech Clause in California State Constitution provides more expansive protection than the First Amendment to the United States Constitution.

210.    Stewart and Conway speech is protected speech under the Liberty of Speech Clause of the California State Constitution.

211.    San Francisco Park Code § 7.03 on its face and as applied violates the Liberty of Speech Clause in the California State Constitution.

WHEREFORE, Stewart and Conway respectfully pray the Court grant the equitable and legal relief set for the prayer for relief

## PRAYER FOR RELIEF

WHEREFORE, Stewart and Conway respectfully pray for relief in that this Court:

A.    Assume jurisdiction over this action;

B.    Enter a judgment and decree declaring San Francisco Park Code § 7.03 unconstitutional on its face and as applied to Stewart and Conway's religious worship and speech because it violates rights and the rights of third parties not before the Court, as guaranteed under the First and Fourteenth Amendments to the United States Constitution, and as guaranteed in the Liberty of Speech Clause in Article 1 of the California State Constitution;

D.    Enter a preliminary and permanent injunction enjoining Defendants, their agents, officials, servants, employees, and all persons in active concert or participation with them, or any of them, from applying San Francisco Park Code §

31

**COMPLAINT**

7.03 so as to restrict constitutionally-protected worship and speech of Stewart, Conway, and other third parties, in San Francisco parks;

E.      Adjudge, decree, and declare the rights and other legal relations with the subject matter here in controversy, in order that such declaration shall have the force and effect of final judgment;

F.      Award Stewart compensatory damages in the amount of $ 576.00, representing the amount of fines he was unconstitutionally required to pay;

G.      Award Stewart and Conway nominal damages each in the amount of $1.00 arising from the acts of the Defendants as an important vindication of their constitutional rights;

H.      Award Conway and Stewart their costs and expenses of this action, including reasonable attorneys' fees, in accordance with 42 U.S.C. § 1988 and other applicable law; and

I.      Grant such other and further relief as appears to this Court to be equitable and just.

Dated:  February 21, 2022

1

Respectfully submitted,

2

| /s/ Robert H. Tyler | /s/ Nathan W. Kellum |
|---|---|
| Robert H. Tyler | Nathan W. Kellum* |
| CA Bar # 179572 | TN BAR #13482; MS BAR # 8813 |
| rtyler@tylerbursch.com | Center For Religious Expression |
| Advocates for Faith & Freedom | 699 Oakleaf Office Lane, Suite 107 |
| 24910 Las Brisas Road, Suite 110 | Memphis, TN  38117 |
| Murrieta, CA 92562 | Telephone: (901) 684-5485 |
| Telephone: (951) 600-2733 | Facsimile: (901) 684-5499 |
| Facsimile:   (951) 600-4996 | Email:  nkellum@crelaw.org |
| | |
| | Attorney for Plaintiff |
| Attorney for Plaintiff | *Application for Admission *Pro Hac Vice* filed concurrently |

## VERIFICATION

1

I, the undersigned, a citizen of the United States and resident of Oakland,

2

California, have read the foregoing Verified Complaint and declare under penalty of

3

perjury, under the laws of the State of California, that the foregoing is true and

4

correct.

5

Dated this 18th day of February, 2022.

6

7

ALEXANDER STEWART

8

9

10

11

12

13

14

15

16

17

18

19

20

21

**COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

## VERIFICATION

I, the undersigned, a citizen of the United States and resident of Oakland, California, have read the foregoing Verified Complaint and declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct.

Dated this 7th day of February, 2022.

ANDREW CONWAY

**COMPLAINT**

1

## <u>CERTIFICATE OF SERVICE</u>

2

3

I hereby certify that on this 21st day of February, 2022, the foregoing document will be delivered to a process server for service upon defendants.

4

5

<u>/s/Nathan W. Kellum</u>
Nathan W. Kellum
Attorney for Plaintiff

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**COMPLAINT**